Filed 5/17/23

**CERTIFIED FOR PUBLICATION**


**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**


|  |  |
|---|---|
| In re I.E., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E080223 |
| Plaintiff and Respondent, | (Super.Ct.No. J287708) |
| v. | OPINION |
| C.E., | |
| Defendant and Appellant. | |


APPEAL from the Superior Court of San Bernardino County. Annemarie G. Pace, Judge. Affirmed.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and David Guardado, Deputy County Counsel, for Plaintiff and Respondent.

C.E. (mother) appeals from an order terminating her parental rights to I.E. (the child) and freeing the child for adoption. Mother's sole claim on appeal is that the juvenile court erred by ruling the parental benefit exception to termination of parental rights did not apply. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i); all undesignated statutory references are to the Welf. & Inst. Code.) The record, especially the child's consistent and compelling statements that she wished to be adopted, amply supports the juvenile court's conclusion that termination of mother's parental rights would not be detrimental to the child. Because we find no abuse of discretion, we affirm.

I.

FACTS AND PROCEDURAL BACKGROUND

On December 22, 2020, San Bernardino County Children and Family Services (CFS) received a referral that mother had exposed the child to domestic violence perpetrated by mother's boyfriend, and mother had taken no steps to protect the child. At first, mother denied being the victim of domestic violence, but she eventually admitted her boyfriend had recently punched her in the face. The child told the social worker that mother and the boyfriend "fight all the time." Mother also acknowledged smoking methamphetamine and marijuana daily. CFS detained the child on January 6, 2021.

CFS filed a petition alleging the child was a dependent pursuant to section 300, subdivision (b), because: mother suffered from substance abuse issues and engaged in domestic violence in the presence of the child, which placed the child at risk of abuse or neglect; and the child's alleged father's substance abuse problem and domestic violence

2

toward mother placed the child at risk of abuse or neglect. Father is not a party to this appeal.

The juvenile court found a prima facie case for detention and ordered the child, who was four years old, detained from mother's custody. And at a combined jurisdiction and disposition hearing, the juvenile court found true the allegations in the petition and ordered the child removed from mother's custody. The court ordered CFS to offer mother family reunification services, including a domestic violence program, individual counseling, parenting education, substance abuse treatment, random drug screening and a 12-step program. Mother was granted supervised visits with the child once weekly for two hours.

In its report for the six-month status review hearing, CFS recommended mother continue receiving reunification services. Mother was actively participating in reunification services, but she struggled with random substance testing and was inconsistent in her programs. CFS also reported it was concerned mother might still have been engaged in a domestic violence relationship because on multiple occasions she appeared for visits with visible injuries. Mother consistently visited the child but was late on several occasions. During one visit, mother struck the child and caused the child to scream and cry. The parties stipulated that the juvenile court could make findings and orders without a formal hearing, and the court ordered that mother continue receiving reunification services and supervised visits once weekly for two hours.

For the 12-month status review hearing, CFS recommended the juvenile court terminate mother's reunification services. Mother was somewhat consistent in visitation,

continued to either miss random substance use screening or tested positively, and failed to complete a substance abuse treatment program. Mother's therapist reported that mother did not benefit from therapy and needed more sessions

The child said she was afraid to return to mother because the child believed mother was still engaged in a domestic violence relationship. The child told mother she did not wish to return home and wanted to remain with her caregiver. After a social worker had told the child she would never be reunited with mother and would never be moved from her most recent caregiver, the child told the caregiver, "'This is the worst and best day of my life. I am so sad that I won't be able to live with my (biological) mom, but so happy that you (resource mother) get to be my forever mom.'" Nonetheless, the child said she still wished to "remain connected" with mother "and continue to have visits with her mother."

At a contested 12-month status review hearing, the juvenile court found that maintaining the child in her current placement versus placing her with a relative was in the child's best interest and ordered that she remain in her foster home. The court also found that mother had only made minimal progress in her case plan and terminated those services. The court reduced mother's supervised visits to once monthly for two hours. And, the court set a permanency hearing under section 366.26 for termination of parental rights.

In its report for the permanency hearing, CFS recommended the juvenile court terminate mother's parental rights and select adoption as the child's permanent plan. Mother was consistent with visitation during the reporting period. But, because she had

enrolled in an inpatient substance abuse program, mother was unable to make some visits but would resume visits when possible.

CFS opined the child was "appropriate for adoption." The child had been placed in her prospective adoptive home for more than one year. She was "well adjusted" to her placement and had a "mutual attachment" to her foster mother, whom the child viewed "as a parental figure." The caregiver reported that the child had started to wet the bed, experienced anxiety about "how her mother [was] doing," and said she wanted "to take care of her mother." But the social worker also reported that, "on multiple occasions," the child told the social worker that "she wants to live with the foster prospective adoptive mother forever and for it to be [her] forever home." When the social worker asked the child if she wanted to be adopted, the child replied she considered the foster mother "as her mother," the foster home "to be her home," and she wanted her foster mother "to be her forever mother." And, when asked if she knew what adoption meant, the child replied it meant she would live with her foster mother "for the rest of her life and live in a safe home."

The child was almost seven years old when the court conducted a contested permanency hearing. Mother testified she had been the child's primary parent prior to the child's detention. She visited the child regularly, during which she and the child played together, watched movies, or read books. Mother brought toys, food, crafts, and clothing for the child. The child was happy and excited to see mother during visits, she would run to mother and hug her, and the child referred to mother as "'Mom.'" The child would ask mother to sing her a special song that mother had made up when the child was

a baby. When it was time for a visit to come to an end, it was "good," and she and the child would prepare for the next visit and stay positive. Mother testified the child was bonded to her, and the child was the "little pea in [her] pod." Despite the separation, mother and the child were "still very close," and the child knew how much mother loved her.

Mother's attorney argued the juvenile court should find applicable the parental benefit exception to termination of parental rights. Counsel for the child and for CFS argued mother could not establish the requirements for the exception.

The juvenile court ruled mother had satisfied the first element for the exception because she had "regular visitation and contact" with the child. After indicating it believed there was "mutual love and affection" between mother and the child, the juvenile court stated, "the real question" was whether the relationship was "substantial enough that terminating the attachment would be detrimental when balanced against the benefits of adoption." The juvenile court seemed to assume the relationship was substantial and positive, and focused its analysis on whether severance of the relationship would be detrimental to the child. The court indicated it had highlighted the child's statements in the report that "she identifies her [caretaker] as her mother, that she wants to stay in that home and have it be her forever home, and that she knows that would be a safe home." Based on the child's statements, the juvenile court concluded "it is in [the child's] best interest to terminate parental rights" and "whatever detriment there is to [the child] is far outweighed by the benefits of permanency."

The juvenile court found by clear and convincing evidence that the child was likely to be adopted and that the child was both generally and specifically adoptable. The court terminated mother's parental rights and selected adoption as the child's permanent plan.

## II.

## DISCUSSION

When the juvenile court finds that a dependent child is likely to be adopted, it must terminate parental rights and select adoption as the permanent plan unless it finds that termination would be detrimental to the child under one of several exceptions. (§ 366.26, subd. (c)(1); *In re Caden C.* (2021) 11 Cal.5th 614, 630-631.) "Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573; see *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["adoption is the norm."].) "'[B]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.'" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.)

One exception is commonly called the parental benefit exception. (§ 366.26, subd. (c)(1)(B)(i).) The parent carries the burden of establishing the exception by a preponderance of the evidence (*In re Caden C.*, *supra*, 11 Cal.5th at p. 636), meaning the parent must prove it is "'more likely than not'" the exception applies (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995). To establish that the parental benefit exception applies, the parent must show three things: "The parent must show regular visitation and contact

7

with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption." (*In re Caden C.*, at pp. 636-637.)

Our review of the juvenile court's ruling on whether the parental benefit exception applies incorporates both the substantial evidence and the abuse of discretion standards. (*In re Caden C.*, *supra*, 11 Cal.5th at pp. 639-641.) We apply the substantial evidence standard of review to the first two elements of the exception and the abuse of discretion standard to the third element. (*Ibid.*) "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) Under the abuse of discretion standard of review, we determine whether the juvenile court's decision exceeded the bounds of reason and, in so doing, we cannot substitute our view for that of the juvenile court. (*In re Caden C.*, at p. 641; *In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

8

"Assessment of the first component is 'quantitative and relatively straightforward, asking whether visitation occurred regularly and often.' [Citation.] It is an evaluation of 'whether the parent consistently has contact with the child.' [Citation.] '"Sporadic visitation is insufficient."'" (*In re A.G.* (2020) 58 Cal.App.5th 973, 994-995.) "Visits and contact 'continue[] or develop[] a significant, positive, emotional attachment from child to parent.' [Citation.] Courts should consider in that light whether parents 'maintained regular visitation and contact with the child' (§ 366.26, subd. (c)(1)(B)(i)) but certainly not to punish parents or reward them for good behavior in visiting or maintaining contact—here as throughout, the focus is on the best interests of the child." (*In re Caden C.*, *supra*, 11 Cal.5th at p. 632.) The juvenile court found mother had met the element "of regular visitation and contact," so we need not address it further.

For the second element, "the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.] . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.] Doing so properly focuses the inquiry on the child, even as courts must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*In re Caden C.*, *supra*, 11 Cal.5th at p. 632.) As to the third element, courts must "determine . . . how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id*. at p. 633.) "That subtle, case-specific inquiry is what the statute asks

courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]'" (*Ibid.*)

Mother argues the record amply supports a finding that her relationship with the child was substantial, positive, and emotional, and that the court erred by concluding termination of parental rights would not be detrimental to the child. She argues evidence about her visits demonstrated the child had "considerable affection" for her; the child had expressed her desire "to remain connected" to mother and to continue visiting with her; and, the child had expressed "significant concern" and anxiety about mother and had stated she wanted to take care of mother. According to mother, these facts demonstrate both a "strong relationship" with the child and "the child's need for Mother to remain in her life."

There is no dispute that visits between mother and the child were meaningful and that the two showed affection for each other, and that, before the juvenile court terminated mother's family reunification services and set a permanency hearing, the child had expressed the desire to maintain a connection with mother and to continue having visits. But mother's own testimony showed the child experienced no distress at the end of visits, which tends to support the juvenile court's conclusion that the relationship was not so substantial that its severance would be detrimental to the child.

And, more importantly, mother ignores the child's statements in the report for the permanency hearing on which the juvenile court relied when it concluded termination of parental rights would not be detrimental to the child. As mother correctly indicates in her

10

brief, the social worker had reported that the child had started to wet the bed, experienced anxiety about "how her mother [was] doing," and had said she wanted "to take care of her mother." But the social worker also reported the child was "well adjusted" in her placement, had a "mutual attachment" to her foster mother, and viewed her caregiver "as a parental figure." Crucially for our purposes, "on multiple occasions" the child told the social worker she wanted to "live with the foster prospective adoptive mother forever" and for her foster home to be her "forever home." When the social worker broached the subject of adoption, the child said she already considered her caregiver to be her mother, and the child said she wanted her caregiver "to be her forever mother." And, when asked specifically if she knew what adoption meant, the child said it would mean she would live with her foster mother "for the rest of her life and live in a safe home." These statements were consistent with the child's previous statements as reported for the 12-month review hearing, that she feared being reunited with mother, that she wanted to be adopted, and that she was happy that her caregiver would be her "forever mom."

Citing *In re Caden C.*, *supra*, 11 Cal.5th 614, mother argues that whether the child "had a good relationship with the caregiver and wanted to remain in the home is not relevant to the [detriment] analysis." Mother reads that decision too broadly. What the Supreme Court actually said was: "When it weighs whether termination would be detrimental, the [juvenile] court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)"; "courts should not look to whether the parent can provide a home for the child; the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on

11

balance, by the security of a new, adoptive home"; and, "the section 366.26 hearing is decidedly not a contest of who would be the better custodial caregiver." (*In re Caden C.*, at p. 634.) The focus is properly on whether the child will suffer detriment from losing the relationship with the parent. (*Id*. at p. 633.) By taking the child's wish to be adopted by her caregiver into consideration, the juvenile court properly focused on whether the child would suffer detriment from losing the relationship with mother and did not inappropriately compare the mother's ability to care for the child versus the foster mother.

The social service agency's report for a permanency hearing must include "a statement from the child concerning placement and the [recommended] adoption or guardianship . . . ." (§ 361.5, subd. (g)(1)(E); see §§ 366.21, subd. (i)(1)(E), 366.22, subd. (c)(1)(E).) In addition, appointed counsel for a dependent minor who is four years of age or older must interview the child, determine the child's wishes, and report those wishes to the juvenile court. (§ 317, subd. (e)(2); *In re N.O.* (2019) 31 Cal.App.5th 899, 935, fn. 12.) "At all proceedings under section 366.26, the court must consider the wishes of the child and act in the best interests of the child. (§ 366.26, subd. (h)(1).)" (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1231.) "The juvenile court should explore a child's feelings toward his or her parents, foster parents, and prospective adoptive family. [Citations.] Evidence of a child's wishes may, but need not, be in the form of direct testimony at the parental rights termination hearing; such evidence may also appear in the Agency's reports." (*In re Christopher L.* (2006) 143 Cal.App.4th 1326, 1334.)

"The purpose of the statutory injunction that the court 'consider the wishes of the child' simply requires the court to consider what the child's preferences are. It is a reminder to all, but particularly those weighted with the decisionmaking responsibility, that the child is not a cipher in the process. While we are both statutorily mandated and morally constrained to act in the best interests of the child, to the extent possible the child should have some voice. It is, after all, their futures we decide, their destinies we begin and their entire lives we affect." (*In re Leo M.* (1993) 19 Cal.App.4th 1583, 1592-1593.)

A child's "feelings about adoption are necessarily considered when determining whether the parent-child relationship exception to termination of parental rights applies in [a given] case." (*In re Scott B.* (2010) 188 Cal.App.4th 452, 472, fn. 4; see *In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1085 [child's testimony would have been relevant to determining possible application of parental benefit exception].) The child's wishes are not necessarily determinative of whether termination of parental rights will be in the child's best interest. (*In re C.B.* (2010) 190 Cal.App.4th 102, 125; *In re Joshua G.* (2005) 129 Cal.App.4th 189, 201.) Nonetheless, the child's wishes may be highly relevant evidence when determining whether termination of parental rights will be detrimental to the child. (Cf. *In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432 [Child's testimony that they wanted to live with their mother, in support of mother's request for modification of order placing the child in foster care, "constitutes powerful demonstrative evidence that it would be in [the child's] best interest to allow [them] to do so."]; *In re Michael D.* (1996) 51 Cal.App.4th 1074, 1087 [same].)

13

The child's unequivocal (and uncontradicted) statements in this case powerfully demonstrate the child did not have the type of attachment with mother that would cause the child to suffer detriment in the event of a termination of parental rights. Therefore, on this record, we cannot conclude the juvenile court abused its discretion.

## III.

## DISPOSITION

The order terminating mother's parental rights is affirmed.

CERTIFIED FOR PUBLICATION

McKINSTER
Acting P. J.

We concur:

MILLER
J.

MENETREZ
J.

14